No. 116,692

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

VIA CHRISTI HOSPITALS WICHITA, INC.,
*Appellant*,

v.

KAN-PAK LLC, *et al.*,
*Appellees*.

SYLLABUS BY THE COURT

1.

A rule or regulation adopted by an administrative agency may only be given binding legal effect if the agency has complied with the requirements of the Rules and Regulations Filing Act when it creates or amends the rule.

2.

The Filing Act requires the preparation and filing of an economic impact statement assessing the economic effect of any amendment to an administrative rule or regulation.

3.

The failure by an administrative agency to assess the economic impact of an amendment of an administrative regulation renders the amendment void and unenforceable.

4.

The Judicial Review Act permits a court to grant relief if the agency action is unreasonable, arbitrary, or capricious.

1

5.

The enforcement of an accidentally amended rule, adopted in noncompliance with the Filing Act, is an arbitrary or capricious action.

Appeal from Workers Compensation Board. Opinion filed August 25, 2017. Reversed.

*Edward D. Heath, Jr.*, of Law Office of Edward D. Heath, Jr., of Wichita, for appellant.

*Douglas C. Hobbs* and *Ryan D. Weltz*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Wichita, for appellees.

Before HILL, P.J., MCANANY and ATCHESON, JJ.

HILL, J.: This case illustrates why we have courts of law. There are times when rules created haphazardly must not be enforced because the consequences flowing from their enforcement nullify the good policy promoted by other, properly created rules. This is especially true here, where the rule enforced by the Workers Compensation Hearing Officer and then the Kansas Workers Compensation Appeals Board was unintended in its creation—an accident at birth. Administrative agencies, for many reasons, must follow established procedures in creating rules, and any enforcement of a rule not so created is arbitrary and capricious and must be struck down.

The facts here are uncontested. In 2011, Darin Pinion received horrible burns while he was working for Kan-Pak, LLC. Via Christi Hospitals Wichita, Inc. treated Pinion for his burns. Kan-Pak's workers compensation insurance carrier was Travelers Indemnity Company of America. Travelers contracted with Paradigm Management, LLC to assume the claim. In turn, Via Christi billed Paradigm over a million dollars for Pinion's medical treatment. Relying on the published 2011 Kansas Workers Compensation Schedule of Medical Fees, Paradigm paid Via Christi just $136,451.60. Via Christi contends the payment was short by almost $600,000.

2

This dispute concerns a single sentence in the 2011 Kansas Department of Labor Workers Compensation Schedule of Medical Fees. The year before, the 2010 fee schedule introduced an independent methodology called the "stop-loss method" to reimburse hospitals for "unusually costly services rendered during treatment to an injured worker." The stop-loss method provided that if the total charges of an inpatient hospital stay equaled or exceeded $60,000, the total charges were multiplied by 70 percent to determine the allowed reimbursement. If charges did not reach the $60,000 stop-loss threshold, then hospitals were reimbursed using the traditional Medicare Severity-Diagnosis Related Group (MS-DRG) method.

This stop-loss methodology was again included in the 2011 fee schedule. But unbeknownst to the Workers Compensation Division's manager of medical services and the appointed medical administrator, who were in charge of shepherding the revisions through the regulatory process, the published 2011 fee schedule also included this statement:  "If the MS-DRG level of reimbursement exceeds the $60,000 stop-loss threshold, the facility shall be paid billed charges multiplied by seventy percent (70%) or the MS-DRG level *whichever is least*; all other rules apply to making this determination." (Emphasis added.)  This small addition changed everything.

It appears that a small flaw was woven into the weft of a 232-page regulation. A brief clause, tucked into a mountain of words, changed the meaning of a carefully composed and thoroughly studied rule. It changed policy when no one in authority intended the policy to be changed.

No one in this record can say how this rule was changed or why this rule was changed, but they can say the rule was changed. It was promptly amended the next year, eliminating the "whichever is least" language, preserving the stop-loss provision as it originally was. Insurance companies that inquired about the "whichever is least" provision were told by the Division's manager of medical services that it was an error and

3

to ignore it. The insurance companies followed the advice and ignored the provision. Apparently, no one told Paradigm to ignore it.

Paradigm, a workers compensation catastrophic case management utility that manages and facilitates care coordination for injured workers, insists that it was only required to reimburse Via Christi at the MS-DRG level and not the stop-loss level, resulting in a $600,000 difference. In Paradigm's view, this was a properly published regulation that must be enforced. It had no notice of any claims from the Workers Compensation Division that the clause was accidentally inserted into the published rules and, thus, was meaningless.

Seeking the protection of the stop-loss, Via Christi sought a formal review of this dispute under 2010 Supp. K.S.A. 44-510j. After a careful and very thorough review of all the testimony, the hearing officer concluded that the addition of the "whichever is least" provision in the 2011 fee schedule was unknowing, inadvertent, and unintentional. The hearing officer would have declared the provision void and unenforceable but instead, found he lacked authority to rule an administrative regulation void. The Kansas Workers Compensation Appeals Board, after carefully reviewing the record, ruled that the hearing officer was correct. In the end, it too is powerless to change the rules.

Without a doubt, both the hearing officer and the Board are correct; both are powerless to change the rules. It is their task to enforce rules, not create them. The hearing officers find facts and apply the rules to the facts and interpret the rules as the circumstances of each case require. For its part, the Board will review the work of the hearing officer and make whatever corrections are required. But indeed, they are powerless to say, "This rule we will not enforce because it is wrong." To permit that would reduce rulemaking to the whim, no matter how reasonable, of the hearing officer or the Board. Nonetheless, rulemaking is one of the fundamental tasks assigned to our administrative agencies. This process of rule creation is elaborate and painstaking. Many

4

views are taken into account before the final rule is published. We now focus on rulemaking by this agency.

Since 1990, the Kansas Legislature has required the director of the Division of Workers Compensation to adopt rules and regulations which establish a schedule of maximum fees for medical, surgical, hospital, dental, nursing, vocational rehabilitation, or any other treatment or services provided to employees under the Workers Compensation Act. See K.S.A. 1990 Supp. 44-510(a)(1); K.S.A. 2016 Supp. 44-510i(c). The fee schedule must satisfy certain statutory directives of reasonableness and scope. It:

- shall be reasonable;
- shall promote health care cost containment and efficiency with respect to the workers compensation health care delivery system;
- shall be sufficient to ensure availability of such reasonably necessary treatment, care, and attendance to each injured employee to cure and relieve the employee from the effects of the injury; and
- shall include provisions and review procedures for exceptional cases involving extraordinary medical procedures or circumstances. K.S.A. 2016 Supp. 44-510i(c)(1).

The law calls on the director to appoint a specialist in health care services delivery to assist in preparing the fee schedule. That person is referred to as the medical administrator. See K.S.A. 2016 Supp. 44-510i(a)-(b). For this case, the medical administrator was Dr. Terry A. Tracy. The statute also creates an advisory panel to assist the director in establishing the fee schedule. K.S.A. 2016 Supp. 44-510i(d).

The director utilizes the Division's manager of medical services to shepherd revisions to the fee schedule through the regulatory process. Here, that person was Anne

5

Haught. Haught practiced as a registered nurse for 12 years and is a licensed attorney. Haught also served as the director at certain points during this period.

The fee schedule is incorporated by reference into K.A.R. 51-9-7. By law, the fee schedule must be updated at least every 2 years to ensure the schedule is "current, reasonable and fair." K.S.A. 2016 Supp. 44-510i(c)(2).

Generally, the process for updating the fee schedule begins with the collection of data from the top 20 insurance carriers in Kansas. Next, Division personnel meet with those involved, like Via Christi, the Hospital Association, and the Medical Society to talk about potential updates to the fee schedule. Their starting point is Medicare's Risk Base Relative Value System. Proposed changes to the fee schedule are then presented to the statutorily mandated advisory panel.

Following review by the advisory panel, proposed changes are sent to the National Council on Compensation Insurance for pricing. The Council reviews the changes and provides an estimate of how the changes will affect workers compensation insurance premiums in Kansas. For example, regarding the 2010 fee schedule, the Council noted that it reviewed for reasonableness the Kansas Department of Health and Environment's estimate that the new hospital inpatient fee schedule (including the new stop-loss limit of $60,000) would result in a savings in hospital inpatient costs. The Council's analysis is then incorporated into the economic impact statement for the fee schedule changes. The law requires an economic impact statement whenever a rule or regulation is proposed or amended. See K.S.A. 2016 Supp. 77-416(b)(1). That is true here, as well.

The fee schedule then goes through the regulatory process beginning with approval by the Department of Administration, followed by the Attorney General's Office, and then it is set for a public hearing. The medical administrator or manager of medical services testifies before the joint committee on rules and regulations. Finally,

there is a public hearing. Upon completion of the regulatory process, K.A.R. 51-9-7 is updated, incorporating the new fee schedule by reference. The fee schedule is published effective January 1 of the next year.

Necessarily, this rulemaking is a careful, methodical process. Here, the fee schedule begins with the collection of data, and amendments are then drafted by medical experts who consult with various stakeholders about the effect of any changes. A National Council reviews the schedule to estimate the possible effects of the schedule on workers compensation insurance premiums. The changes are then reviewed by the Department of Administration and the Kansas Attorney General. Sworn testimony is offered and considered. Public hearings are conducted and considered. Nothing is left to chance. But as in all human endeavors mistakes are made. Fortunately, there are standards created by the law that serve as a gauge to measure these rules.

A rule or regulation adopted by an administrative agency may only be given binding legal effect if it has complied with the requirements of the Rules and Regulations Filing Act. See K.S.A. 2016 Supp. 77-415. One of the primary requirements for a new rule, such as the 2011 fee schedule, is an economic impact statement from the agency proposing the rule. This is set out in K.S.A. 2016 Supp. 77-416(b)(1). There are four considerations listed in the statute; but we focus primarily on subsection (b)(1)(C) that requires the agency to describe the costs affected by the proposed rule, who shall bear them, and how much will they be.

That determination of costs by the agency was not done here for the inserted "whichever is least" language amending the 2011 fee schedule. There was no study conducted of the costs of this amendment; no estimation of how much; nor was it announced upon whom the costs were going to fall. While there was an economic impact report contemporaneously filed with the schedule, it did not assess the impact of the "whichever is least" language. In other words, by failing to estimate the costs affected by

7

the inclusion of this language and, thus, amending the rule, the amendment failed to comply with the Filing Act. Failure to comply with the Filing Act breaks the rules of rulemaking and leads to court excision of improperly promulgated rules. This principle has been recognized before.

For example, in *American Trust Administrators, Inc. v. Kansas Insurance Dept.*, 273 Kan. 694, Syl., 44 P.3d 1253 (2002), the Kansas Supreme Court held the Commissioner of Insurance had authority to regulate stop-loss insurance offered to self-funded employer health plans. But the Commissioner's attempt to regulate the stop-loss policy in the particular case was void for failure to follow procedures outlined in K.S.A. 77-415 *et seq*. The Commissioner based the refusal to approve the petitioner's insurance policy on a widely distributed bulletin that was not properly promulgated under K.S.A. 77-415 *et seq*. The court held a widely distributed bulletin was not a valid substitute for a properly promulgated rule or regulation. 273 Kan. at 704. Consequently, the Commissioner's attempt to regulate the stop-loss policy was void. 273 Kan. at 694. The agency's failure to comply with the Filing Act here seems similar to the failure of the commissioner in *American Trust Administrators*. Actions enforcing improperly promulgated rules are void.

Before we conclude, we turn briefly to what seems obvious. Insertion of this "whichever is least" language guts the stop-loss provision created the year before in the 2010 fee schedule. The phrase clearly contravenes the stated purpose of the stop-loss method. With that method, if the total charges exceed the stop-loss amount ($60,000), then the facility can be paid 70 percent of the billed charges. But with the "whichever is least" limitation, the stop-loss would never kick in. The hospital could actually only receive the *lesser* MS-DRG reimbursement amount. The stop-loss cannot be "an independent reimbursement methodology that will reimburse the hospital for unusually costly services rendered during treatment to an injured worker" if the "whichever is least" sentence is given effect.

The legislature created our administrative agencies to regulate particular segments of our government. Charged with such great tasks, the agencies must collect all pertinent data, seek competent expert assistance, study all the conditions, and then create workable regulations and rules that carry out the broad policies of the legislature or those policies the legislature has delegated to the agency to create and develop. Such rulemaking is no easy task; too many people and too many economic interests are affected by these rules to leave this to chance—that is, to the accidental insertion of one small phrase in a 232-page regulation.

If we were to approve the Board's ruling and enforce this rule, our holding would be as arbitrary as the Board's. Essentially, we would be saying that it is a rule; therefore, it must be enforced even though it was created accidentally. Once created, rules are not indestructible. The Judicial Review Act permits this court to grant relief if the agency action is unreasonable, arbitrary, or capricious. See K.S.A. 2016 Supp. 77-621(c). The enforcement of an accidentally created rule is the very picture of an arbitrary or capricious action, and we reverse the Board's ruling enforcing it.

Reversed.